**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LEAH MANZARI, PKA Danni Ashe, *Plaintiff-Appellee*, <br><br> v. <br><br> ASSOCIATED NEWSPAPERS LTD., *Defendant-Appellant.* | No. 14-55329 <br><br> D.C. No. 2:13-cv-06830-GW-PJW <br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted February 12, 2016
Pasadena, California

Filed July 25, 2016

Before: Andrew J. Kleinfeld, M. Margaret McKeown,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge McKeown

**SUMMARY**[*]

**Defamation /California's Anti-Strategic Lawsuit
Against Public Participation Statute**

The panel affirmed the district court's order denying the
Associated Newspapers Ltd.'s motion to strike a complaint
pursuant to California's anti-Strategic Lawsuit Against Public
Participation statute, in an action alleging defamation by Leah
Manzari, a pioneer in the online adult entertainment industry
and famous under her professional name, Danni Ashe.

Manzari alleged that Associated News Ltd., in its online
tabloid newspaper, the Daily Mail Online, used a photograph
of her to convey the defamatory impression that she had
tested positive for HIV. The panel agreed with the district
court that, at this stage in the litigation, Manzari had
presented sufficient evidence to move forward with her claim
that Daily Mail Online employees acted with actual malice
when they published an article implying that Manzari was an
HIV-positive sex worker.

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

**COUNSEL**

Katherine M. Bolger (argued), Levine Sullivan Koch & Schulz, LLP, New York, New York; Louis P. Petrich, Leopold, Petrich & Smith PC, Los Angeles, California; for Defendant-Appellant.

Steven L. Weinberg (argued), Wein Law Group, LLP, Los Angeles, California, for Plaintiff-Appellee.

## OPINION

MCKEOWN, Circuit Judge:

A picture is worth a thousand words.  A photograph, especially when coupled with text, can convey a powerful message:  in this case, a potentially defamatory one.  Leah Manzari, famous under her professional name, Danni Ashe, for her groundbreaking work in monetizing online pornography, claims that the Daily Mail Online, an online news outlet, used a photograph of her to convey the defamatory impression that she had tested positive for HIV.

Defamation claims, which arise out of state law, are significantly cabined by the First Amendment, especially when the plaintiff is a public figure, like Manzari. In order to prevail, Manzari must show that the Daily Mail acted with actual malice.  Defamation by implication claims pose an additional hurdle:  Manzari must first show that the article is reasonably understood to imply the defamatory statement, and she must then show that the Daily Mail published the article with knowledge of the false implication or reckless disregard for the truth of what the article implied.  This case comes to us as an interlocutory appeal under California's anti-SLAPP statute.  Cal. Civ. Proc. Code § 425.15.  We agree with the district court that, at this stage in the litigation, Manzari has presented sufficient evidence to move forward with her claim that the Daily Mail Online employees acted with actual malice when they published the article implying that Manzari was an HIV-positive sex worker.

### BACKGROUND

As we explain below, we state the facts, from the pleadings and evidence presented, taken favorably to the plaintiff. Manzari is a pioneer in the online adult entertainment industry. Her website www.Danni.com, which she designed and launched in 1995, began generating multi-million dollar revenues in the early 2000s. During this time, "Danni Ashe" was one of the most well-known and popular soft-core porn actresses in the world, as well as a highly successful entrepreneur, with one of the most visited websites on the Web. She retired from the adult entertainment industry in 2004 and sold www.Danni.com, but the website remains active under that name.

Associated News Ltd. publishes the Daily Mail, a popular United Kingdom-based tabloid newspaper, which also has an online version known as the Daily Mail Online (collectively the "Daily Mail"). In 2013, the Daily Mail Online ran an article covering the shutdown of the Los Angeles-area porn industry caused by a female performer testing positive for HIV. The headline read: "PORN INDUSTRY SHUTS DOWN WITH IMMEDIATE EFFECT AFTER 'FEMALE PERFORMER' TESTS POSITIVE FOR HIV." After a few lines of text, the article contained a picture of Manzari lying suggestively across a bed with "In Bed With Danni" written in neon lights behind her. Under her photograph was the caption: "Moratorium: The porn industry in California was shocked on Wednesday by the announcement that a performer had tested HIV positive." The article stated that the actress was "new to the industry" and that "the performer was not immediately identified." Later in the article were two other photographs, but not of Manzari. One photograph appears to show a naked woman, whose face is not visible,

leaning against a stripper pole. The other picture shows an unidentified couple being photographed while lying on a couch.

The beginning of the article appeared as follows; we have redacted Manzari's face:



## Porn industry shuts down with immediate effect after 'female performer' tests positive for HIV

By JAMES NYE

PUBLISHED: 01:10 EST, 22 August 2013 | UPDATED: 01:10 EST, 22 August 2013

        

The adult film industry in San Fernando Valley in California, announced a moratorium on the making of porn films Wednesday after an actor tested positive for HIV.

The performer was not immediately identified and officials didn't say when the positive test was recorded.

The actor's sex partners are currently being tested by doctors with Adult Production Health and Safety Services, which works with the porn industry.

X-Biz, an adult industry trade magazine, reported that the performer with the HIV-positive test is female and new to the industry says the Los Angeles Daily News.

© © Frederic Neema/Sygma/Corbis

Moratorium: The porn industry in California was shocked on Wednesday by the announcement that a performer had tested HIV positive

'The moratorium will be lifted once the risk of transmission has been eliminated,' Diane Duke, executive director of the industry trade group the Free Speech Coalition, told the Associated Press in an e-mail.

She added that the actor is not believed to have been infected on a film set.

Immediately after the story was published, Manzari's attorney sent the Daily Mail Online a cease and desist letter insisting that it remove Manzari's photograph from the article. The Daily Mail complied. According to Manzari, by then the damage was done—the article had been syndicated and "quickly spread across the globe via the Internet and within minutes, could be seen as far as East Africa and India." Manzari provided examples of Google searches and other search results revealing thumbnails that show only the headline coupled with her photograph, without any explanatory text.

Manzari brought a libel and false light suit against the Daily Mail under California law, which she filed in federal court under diversity jurisdiction. 28 U.S.C. § 1332(a)(2). The complaint sought three million dollars in damages to Manzari's business and reputation. Manzari contends that the juxtaposition of her image with the explosive headline and caption conveyed the impression that she is the performer who tested positive for HIV. Manzari's claim that she does not and has never had HIV is not contested. Instead, the Daily Mail responds that the article made no such implication and that, in any event, it did not intend to convey the impression that the article was about Manzari, but instead simply chose a stock photo to illustrate the article.

The article's author, Daily Mail Online journalist James Nye, claims that the name of the performer who tested positive for HIV was unknown. To illustrate the article, Nye asked the Daily Mail Online's photo desk to supply him with "some pictures representative of the pornographic film industry that . . . contained no nudity." He selected three "stock" photographs, including the one of Manzari, that "clearly conveyed the concept of the pornographic film

industry, showing a camera near a woman on a bed in lingerie." Jack Forbes, the assistant photo editor who initially selected the photographs from the Corbis Images database, stated that he included the photograph of Manzari because it was a "good, non-obscene photograph to illustrate an article about the pornographic film industry." According to Manzari, the Corbis database included the following information with the photograph: "Soft porn actress Danni Ashe, founder of Danni.com, poses in front of a video camera connected to the Internet in one of her studios in Los Angeles in 2000," although this information was not included in the article.

The Daily Mail moved to strike Manzari's complaint under the California anti-Strategic Lawsuit Against Public Participation statute ("anti-SLAPP"), Cal. Civ. Proc. Code § 425.16, on the ground that the defamation suit targeted the news outlet's protected exercise of free speech and that Manzari could not show a probability of prevailing on the merits of her claim. The California anti-SLAPP statute was passed to combat "a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." *Id*. § 425.16(a); *see also id.* § 425.16(b)(1) ("A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.").

The Daily Mail argued that, as a public figure, Manzari would be unable to prove that the news outlet had acted with

actual malice when it published the article.  The district court denied the anti-SLAPP motion to strike, concluding that even if Manzari were a public figure, "having considered the totality of the choices and admissions made by the Mail Online's staff, . . . a jury could reasonably conclude that those who created the Article intended to convey the impression—known by them to be false—that Plaintiff tested positive for HIV."

## ANALYSIS

This case arises from an interlocutory appeal of the district court's denial of the Daily Mail's motion to strike. Denials of California anti-SLAPP motions are appealable orders because the statute operates as an immunity from suit, rather than as a defense. *DC Comics v. Pac. Pictures Corp.*, 706 F.3d 1009, 1015 (9th Cir. 2013).  Through the lense of California's anti-SLAPP statute, we review de novo Manzari's defamation claim.  *See Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013).

## I.  ANTI-SLAPP

California's anti-SLAPP statute provides a burden-shifting mechanism to weed out "lawsuits that 'masquerade as ordinary lawsuits' but are brought to deter common citizens from exercising their political or legal rights or to punish them for doing so." *Batzel v. Smith*, 333 F.3d 1018, 1024 (9th Cir. 2003) (quoting *Wilcox v. Superior Court*, 27 Cal. App. 4th 809, 816 (1994)).  In *Makaeff*, we explained:

> To prevail on an anti-SLAPP motion, the moving defendant must make a prima facie showing that the plaintiff's suit arises from an

> act in furtherance of the defendant's
> constitutional right to free speech. . . . The
> burden then shifts to the plaintiff, . . . to
> establish a reasonable probability that it will
> prevail on its claim in order for that claim to
> survive dismissal. Cal. Civ. Proc. Code
> § 425.16(b)(1); . . . . Under this standard, the
> claim should be dismissed if the plaintiff
> presents an insufficient legal basis for it, or if,
> on the basis of the facts shown by the
> plaintiff, "no reasonable jury could find for
> the plaintiff." *Metabolife Int'l, Inc. v.
> Wornick*, 264 F.3d 832, 840 (9th Cir. 2001)
> (citation and internal quotation marks
> omitted).

715 F.3d at 261 (first citation omitted).

Having published an article on a topic of public interest (i.e. the public health aspects and safety of a large California industry), the Daily Mail easily satisfied its initial burden. There is no serious dispute that the libel and false light suit targeted speech protected by the anti-SLAPP statute. Cal. Civ. Proc. Code § 425.16(e)(3) (including "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest").

The burden thus shifts to Manzari to show a reasonable probability of prevailing on the merits.[1] "Reasonable

---

[1] Because Manzari's libel and false light claims rely on the same set of facts and require her to prove the same elements relevant to this appeal, we consider the two claims collectively. *See Solano v. Playgirl, Inc.*,

probability in the anti-SLAPP statute has a specialized meaning. The statute requires only a minimum level of legal sufficiency and triability. Indeed, the second step of the anti-SLAPP inquiry is often called the minimal merit prong." *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 598 (9th Cir. 2010) (internal quotation marks and citations omitted). *See Metabolife Int'l, Inc.*, 264 F.3d at 840 ("[A] defendant's anti-SLAPP motion should be granted when a plaintiff presents an insufficient legal basis for the claims or 'when no evidence of sufficient substantiality exists to support a judgment for the plaintiff.'" (citations omitted)).

California courts have repeatedly emphasized that "[o]nly a cause of action that lacks even minimal merit constitutes a SLAPP." *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 61 Cal. Rptr. 3d 29, 38 (Ct. App. 2007) (internal quotation marks and citations omitted). "A plaintiff is not required 'to *prove* the specified claim to the trial court'; rather, so as to not deprive the plaintiff of a jury trial, the appropriate inquiry is whether the plaintiff has stated and substantiated a legally sufficient claim." *Mann v. Quality Old Time Serv., Inc.*, 15 Cal. Rptr. 3d 215, 223 (Ct. App. 2004) (citations omitted) (emphasis in original). To determine whether a plaintiff has substantiated a legally sufficient claim, courts look to the pleadings and affidavits presented by both parties, but courts "do not weigh credibility, nor do [they] evaluate the weight of the evidence. Instead, [courts] accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law." *Overstock.com*, 61 Cal. Rptr. 3d at 38.

---

292 F.3d 1078, 1083 n.2 (9th Cir. 2002) (treating California libel and false light claims as substantially equivalent).

## II. PUBLIC FIGURE

The threshold question that frames our defamation analysis is a legal one. Whether an individual is a public figure is a question of law that must be assessed through a totality of the circumstances. *See Reader's Digest Ass'n v. Superior Court*, 690 P.2d 610, 614–15 (Cal. 1984). As the Supreme Court articulated in *Gertz v. Robert Welch, Inc.*, "[i]n some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." 418 U.S. 323, 351 (1974). Even before the Supreme Court's public figure analysis, we observed that public figures for defamation purposes include, "artists, athletes, business people, dilettantes, anyone who is famous or infamous because of who he is or what he has done." *Cepeda v. Cowles Magazines & Broad., Inc.*, 392 F.2d 417, 419 (9th Cir. 1968).

In earlier cases we have attributed public figure status to individuals of comparable (or even less) fame than Manzari. *See Solano*, 292 F.3d at 1081 (television actor on a popular show was a public figure); *Leidholdt v. L.F.P. Inc*, 860 F.2d 890, 893 (9th Cir. 1988) (leader in the anti-pornography movement, who had participated in numerous news article and public debates on the topic of pornography, was a public figure); *Carafano v. Metrosplash.com Inc.*, 207 F. Supp. 2d 1055, 1071–72 (C.D. Cal. 2002) *aff'd on other grounds*, 339 F.3d 1119 (9th Cir. 2003) (television actress with a popular fan website was a general purpose public figure).

Manzari's celebrity in the porn world might mean that she is less of a household name than stars in other sectors of the entertainment industry, but that does not make her fame any less pervasive. The Daily Mail presented extensive support for its position that Manzari is a public figure, including interviews with Manzari (in her persona as "Danni Ashe") and news coverage related to her considerable success performing in and marketing online soft-core porn. Among many other new sources reporting on Manzari's business and career, *The Boston Globe* called Danni Ashe a poster girl for the flourishing online pornography industry, *The Observer* called her "the first cyberporn millionairess," and *The San Francisco Chronicle* noted that by 1999 *Danni's Hard Drive* had more than 27,000 paying subscribers. In an interview Manzari gave to the *Wall Street Journal*, she stated that her website was originally created as an extension of her "fan club" and, as she told *ABCNews.com*, "[p]eople are interested in adult entertainment. They always have and they always will be."

The complaint itself states that Danni Ashe is considered "the most downloaded woman on the Internet" and that her image has "graced the cover of the Wall Street Journal." In the late 1990s, Manzari competed against actress Cindy Margolis to win the Guinness World Record for most downloaded woman on the Internet and, according to both *ABC News* and a press release from her own website, Manzari attained the record with 841, 271, 545 downloads. In an independent study conducted in 2000, Manzari was found to have the most popular site run by and featuring women on the Web, far surpassing the amount of Internet traffic for websites of such ubiquitous celebrities as Martha Stewart and Oprah Winfrey. She has starred in dozens of adult films, and, in addition to giving numerous interviews, Manzari also

testified before Congress during the passage of the Child Online Protection Act in 2000. With millions of Internet downloads, extensive publicity, and broad public exposure, Manzari undoubtedly qualifies as a public figure.

## III.    REASONABLE PROBABILITY OF PREVAILING ON THE MERITS

To prevail, Manzari will eventually need to present clear and convincing evidence that the Daily Mail article contained a defamatory implication and that the Daily Mail acted with "actual malice" when it published the article with her photograph. *See Kaelin v. Globe Comm. Corp.*, 162 F.3d 1036, 1039 (9th Cir. 1998) ("A public figure in a defamation case cannot recover unless he proves by clear and convincing evidence that the defendant published the defamatory statement with actual malice, i.e., with knowledge that it was false or with reckless disregard of whether it was false or not." (internal quotation marks and citations omitted).[2] However, at the anti-SLAPP stage, "[a] public figure who sues for defamation must establish a *probability* that he or she can produce such clear and convincing evidence." *Overstock.com*, 61 Cal. Rptr. 3d at 38 (emphasis added); *see also Burrill v. Nair*, 158 Cal. Rptr. 3d 332, 357 (Ct. App. 2013) ("[W]e must determine [at the anti-SLAPP stage] whether [the Plaintiff] has made a sufficient prima facie showing of facts to sustain her burden of demonstrating a high probability that [the Defendant] published the defamatory statements with knowledge of their falsity or while entertaining serious doubts as to their truth.").

---

**[2]** It is uncontested that Manzari was not the actual subject of the article and the Daily Mail has not presented truth as a defense.

At this juncture in the proceedings, Manzari is not required to "to *prove* the specified claim," *Mann*, 15 Cal. Rptr. 3d at 223 (internal quotation marks omitted).  She need only convince us that her claim has "minimal merit," and she has done so.  *Overstock.com*, 61 Cal. Rptr. 3d at 38.  We agree that Manzari has presented sufficient evidence—both as to the article's defamatory implication and the Daily Mail's actual malice—to survive the anti-SLAPP motion to strike.

## A.  DEFAMATORY IMPLICATION

The Daily Mail did not affirmatively state that Manzari was the performer with HIV, but the implication and the conclusion were neither subtle nor difficult to divine.  The bold headline and its content, juxtaposed with her photograph and yet another caption under her picture that said the industry was "shocked" that a "performer had tested HIV positive," was sufficient for a reasonable reader to infer that Manzari was the performer who had tested positive for HIV.

California law recognizes that a defamatory statement can be either "expressly stated or implied."  *Forsher v. Bugliosi*, 608 P.2d 716, 721 (Cal. 1980) (internal quotation marks and citations omitted).  Thus:

> "If the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or otherwise creates a defamatory implication, he may be held responsible for the defamatory implication, even though the particular facts are correct."  *Weller v. Am. Broad. Co.*, 283 Cal. Rptr. 644, 652 n.10 (Ct. App. 1991) (quoting Prosser,

The Law of Torts § 116 (5th ed. Supp. 1988))
(internal alterations omitted). To state a claim
for implied defamation, however, the
published statement must reasonably "be
understood as implying the alleged
defamatory content." *Id*. at 651 n.8.

*Price v. Stossel*, 620 F.3d 992, 1003 (9th Cir. 2010).

Of course we "must examine the totality of the
circumstances of the publication." *Kaelin*, 162 F.3d at 1041.
"[A] defamatory meaning must be found, if at all, in a reading
of the publication as a whole." *Id*. at 1040. The Daily Mail
suggests this case is different from the classic defamation by
implication case because it did not make *any* statement by
including a stock photograph selected as a "good, non-
obscene photograph to illustrate the article." This
disingenuous approach overlooks the fact that a photograph
itself can convey both an implicit and an explicit message and
that the headline, caption and photograph taken together are
also a statement. As the Supreme Court observed in a similar
context, "words and punctuation express meaning. Meaning
is the life of language." *Masson v. New Yorker Magazine,
Inc.*, 501 U.S. 496, 517 (1991); *see also id.* at 521
(concluding that misquotations of a public figure, implying he
had stated things he did not say, raised a triable jury
question). Likewise, a visual depiction can be the life of
expression.

Considering the article as a whole, we conclude that a
reasonable reader could infer that the article is about Manzari.
The headline begins "Porn industry shuts down after 'female
performer' tests positive for HIV," which is followed by just
four sentences before her photograph. The picture includes

her professional name "Danni" in neon lights behind her and the bold caption below her reads "Moratorium:  The porn industry in California was shocked on Wednesday by the announcement that a performer had tested HIV positive." The vague references to the unidentified "female performer" do not clarify that the article is not about Manzari, particularly given the size and placement of the photographs and text.

The clarity of the implication is all the more apparent given how news spreads across the Internet.  As Daily Mail Online—a leader and professional in online publishing—would no doubt be aware, links to news articles frequently appear in online search engines or other compilations with only a headline and photograph connected to that story.  Publication of the first story was just a platform for inevitable further online dissemination. Manzari introduced multiple screen-shots from the Internet revealing how the article appeared in a number of search engines and other on-line news platforms.  These images spread rapidly across the Web once the Daily Mail Online published the article, and, in example after example, the posting is truncated with the headline followed directly by the "Danni" photograph, sometimes including a caption, but without the rest of the article to provide any further context for the image.

The Daily Mail contends that the text of the article—specifically its assertion that the performer in question was new to the industry and had not been identified—is logically inconsistent with the inference that the actress in question was Manzari.  It underscores that the explanatory text appears on the same page as the headline and the photograph of Manzari, such that a reasonable reader would realize that she was not the woman who had tested

positive for HIV.  In this regard, the *Kaelin* case is instructive.  There we held that:  "headlines are not irrelevant, extraneous, or liability-free zones[, t]hey are essential elements of a publication," and that false insinuations in a headline on the cover page were not cured or negated by explanatory language later in the magazine because "[a] reasonable juror could conclude that the Kaelin article was too far removed from the cover headline to have the salutary effect that Globe claims."  162 F.3d at 1040–41; *see also Davis v. Hearst*, 160 Cal. 143, 187 (1911) (holding that an article's explanatory text did not negate the defamatory nature of the headline).

The same is true here.  A passing reference buried in the article can hardly cure the obvious message conveyed by the headline, photo and caption.  Manzari has presented sufficient evidence to carry her burden of showing a reasonable probability of success on the merits regarding the first prong of her defamation claim.

## B.  ACTUAL MALICE

The Supreme Court has provided a framework through which we assess whether a public figure can move forward with a defamation claim.  In *Masson*, the Court explained that "actual malice" presents a question of fact:  "The constitutional question we must consider here is whether, in the framework of a summary judgment motion, the evidence suffices to show that respondents acted with the requisite knowledge of falsity or reckless disregard as to truth or falsity."  501 U.S. at 513.  The Court concluded that "[t]he record contains substantial . . . evidence, . . . which, in a light most favorable to petitioner, would support a jury determination under a clear and convincing standard that [the

author acted] deliberately or recklessly." *Id.* at 521. Although the author "contests petitioner's allegations, . . . only a trial on the merits will resolve the factual dispute. . . . [A]t this stage, the evidence creates a jury question whether [the author] published the statements with knowledge or reckless disregard of the alterations." *Id*.

In implied defamation cases, "where a statement . . . reasonably implies false and defamatory facts regarding public figures or officials, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990). "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Time, Inc. v. Pape*, 401 U.S. 279, 291–92 (1971). This standard ensures that publishers are not held liable for unintentional misstatements or implications, which public figures later claim are defamatory. *See Howard v. Antilla*, 294 F.3d 244, 252 (1st Cir. 2002) ("[I]mplications perceived in a statement but not intended by the speaker cannot be actionable in public official or public figure cases.") (quoting Robert D. *Sack, Libel, Slander, and Related Problems* § 5.5.1, at 5–64 (3d ed. 1999)).[3]

---

[3] Our sister circuits have also adopted a standard of subjective awareness of the implication. *See Compuware Corp. v. Moody's Inv'rs Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007) (defendant must have intended or knew of the implied meaning); *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1241 (11th Cir. 1999) (to show actual malice in an implied defamation case, the plaintiff must show that the defendant "entertained serious doubts" that the "underlying thrust" of the publication was true

Defamation by implication against public figures is an area of law "fraught with subtle complexities." *White*, 909 F.2d at 518. We have not always charted a clear path when applying the actual malice test to implied defamatory content. *Compare Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1187 (9th Cir. 2001) ("evidence must clearly and convincingly demonstrate that [the publisher] knew (or purposefully avoided knowing) that the photograph would mislead its readers"), *with Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 680–81 (9th Cir. 1990) (holding that failure to foresee the possible implications of a statement does not give rise to liability against a public figure, rather the relevant inquiry is one of subjective intent) *and*, *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1063–64 (9th Cir. 1998) ("In order to prevail on his claim that ABC's direct statements impliedly defamed him . . . [the plaintiff] must show . . . that ABC intended to convey the defamatory impression." (internal quotation marks and citations omitted)). Although our cases have referenced actual malice with some variation in language, at its core our precedent mirrors the Supreme Court's requirements: knowledge of falsity or reckless disregard for the truth.

---

(internal quotation marks omitted)); *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990) (defamation by implication possible where "the communication, by the particular manner or language in which the true facts are conveyed, supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference"); *Saenz v. Playboy Enter., Inc.*, 841 F.2d 1309, 1318 (7th Cir. 1988) ("[W]here the plaintiff is claiming defamation by innuendo, he also must show with clear and convincing evidence that the defendants intended or knew of the implications that the plaintiff is attempting to draw from the allegedly defamatory material.").

This case rests on the "reckless disregard" prong of actual malice. Recognizing that California law requires only "minimal merit" to withstand initial dismissal under the anti-SLAPP statute, we hold that Manzari has raised sufficient factual questions for a jury to conclude that the Daily Mail Online acted with reckless disregard for the defamatory implication in its article on the Los Angeles porn industry shut-down. Manzari's evidence is sufficient to support her claim that the Daily Mail Online placed her photograph in the article, juxtaposed with the incendiary headline and caption, "[knowing or acting] in reckless disregard of whether its words would be interpreted by the average reader as a false statement of fact." *Solano*, 292 F.3d at 1084 (internal citations, alterations, and quotation marks omitted).

The undisputed message that the article is about Manzari—apparent from the headline, photograph, and caption—supports the conclusion that the Daily Mail Online acted with reckless disregard. Though it is not enough that the defamatory implication "should have been foreseen" by the Daily Mail when it juxtaposed the different elements of the article, *see Newton*, 930 F.2d at 680, or that an "ordinary viewer would have perceived the implication," *Dodds*, 145 F.3d at 1064, here there is evidence that Daily Mail employees actively removed key contextual information from the "Danni Ashe" photograph as it was presented in the Corbis database, which stated: "Soft porn actress Danni Ashe, founder of Danni.com, poses in front of a video camera connected to the Internet in one of her studios in Los Angeles in 2000." Instead, they replaced this information with the caption: "Moratorium: The porn industry in California was shocked on Wednesday by the announcement that a performer had tested HIV positive." The publishers also failed to include any explanation or disclaimer adjacent to the

"Danni" photograph, which would have informed readers that she was not the subject of the article.  *See Eastwood*, 123 F.3d at 1253, 1256 (observing that "[a]s we have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published, we must be guided by circumstantial evidence," and concluding that the "totality of the [editors'] choices" supported a finding of actual malice).

It is no surprise that the Daily Mail employees deny that they understood or intended to make any implication about Manzari.  While a finding that the publisher's testimony lacks credibility cannot on its own sustain a finding of subjective intent,  *Newton*, 930 F.2d at 680, the denial must be read in the context of other evidence.  If all a publisher needed to do was to deny the allegation, all implied defamation suits would be dead on arrival.  If, for instance, a newspaper ran the headline:  "High Profile Figure Accused of Murder" alongside a photograph of the Mayor of New York, or "Industry Shocked that Grocery Sprayed Veggies with Pesticide" alongside an image of a nationally-known grocery chain, the publishers would be hard-pressed to plausibly claim that they had simply selected a "stock" photograph. The same holds true for a story about the pornography industry, featuring a picture of a world-famous pornographic actress with her name written in neon lights behind her.[4]  This sort of willful blindness cannot immunize publishers where they act with reckless disregard for the truth or falsity of the implication they are making.  Manzari meets the "minimal merit" threshold to avoid outright dismissal of her complaint.

---

[4] One need only look to the Daily Mail's own evidence of Manzari's public figure status to confirm the ubiquity of her image and her identity. Her image can hardly be relegated to the status of a "stock" photograph.

## CONCLUSION

At the anti-SLAPP stage, Manzari has carried her burden of "stat[ing] and substantiat[ing] a legally sufficient claim." *Mann*, 15 Cal. Rptr. 3d at 223. The district court properly denied the Daily Mail's motion to strike Manzari's complaint.

**AFFIRMED.**